Good morning, G&S Livingston Realty, Inc. vs. CVS. Your Honors, I'd like to reserve three minutes for rebuttal time. That's great. Good morning, Your Honor. Stephen Falanga from Connell Foley on behalf of the appellant, G&S Livingston Realty, Inc. May it please the Court. This appeal involves the District Court's decision below, refusing to enforce an absolute unconditional guarantee of the appellee, CVS. CVS had no defenses to the unconditional guarantee, and the District Court recognized that the guarantee was unambiguous and clear on its face and should be enforced as written. However, applying principles of surety law that have no applicability to unconditional guarantees under New Jersey law, the District Court allowed CVS to invoke a co-tenancy provision in the underlying lease between G&S and Linens & Things, and by invoking that co-tenancy provision, terminate the lease and therefore avoid liability under the guarantee. The District Court's decision is at odds with the case law supporting the enforcement of unconditional guarantees, particularly in the commercial context. Now, by way of history, G&S owned a shopping center in Livingston, New Jersey, and there were four tenants that moved into the shopping center over a period of approximately a year. G&S entered into its lease with Linens & Things in June of 1996, and at that same time, on that same day, it bargained for and negotiated for an unconditional guarantee of Linens & Things' performances under the lease by Melville Corporation, which at the time, CVS's successor to Melville Corporation. Is your first argument that the lease was terminated because it was terminated, CVS could not assert any defenses? Yes, Your Honor. So termination really is your first point, isn't it? Well, the main point, Your Honor, is that the unconditional nature of the guarantee prohibits CVS from reaching into the underlying lease. Unconditional, there's no condition, you have to pay, and that's it. Correct, and trying to invoke provisions that would have been the right of the underlying tenant, in this case, Linens & Things. That's really your point, is that a guarantor, unless it is assigned the rights under the tenant's lease, has no ability to exercise options or exert rights that the tenant has. I mean, isn't that your key point? Absolutely, Your Honor, that's correct. Does termination matter? Well, it matters in the sense that CVS takes the position, the appellee takes the position that because the lease was not terminated, according to them, by virtue of Linens & Things bankruptcy, subsequent surrender of possession, G&S taking over the premises, changing the locks, all the indicia of accepting surrender, that it had the right, and the district court found, based on a conclusion that the lease had not been terminated, that it could invoke this co-tenancy provision. Doesn't the lease say, though, that you can retake, you can re-let, you can get in there, and that's not necessarily terminating the lease? Well, yes, Your Honor. There are provisions in the lease that talk about G&S assuming possession on behalf of the tenant versus on behalf of itself, but those provisions are not applicable in this situation because in this under Title 11 of the U.S. Bankruptcy Code, and rejecting the lease under 365 of the Bankruptcy Code. Rejection is not a termination, is it? Well, Your Honor, there are some cases that say that it is a termination, and some cases that say that it is not. And the cases that conclude, and Collier's is a noted bankruptcy source, concludes that the mere rejection of the lease in bankruptcy should not act as a What do you make of 365G of the Bankruptcy Code, which says that the rejection of an executory contract constitutes a breach of the contract? It doesn't say termination of the contract. That's right, Your Honor. It doesn't say termination. It says breach. However, in the commercial context, when you're dealing with commercial leases, which is this case, upon rejection in bankruptcy, the code also says that the debtor must immediately surrender the premises to the That's fine. Does that mean that the lease is terminated? That's correct, Your Honor. It doesn't mean the lease is terminated. And so then you look to New Jersey state law, which Wait a minute. Well, what about 365G that says that rejection is not termination? It's basically a breach of the contract. It is a breach of the contract. And if you took that argument, that Linens was in breach of the lease, it also could not invoke the co-tenancy provisions, because under New Jersey law, a breaching party doesn't have the right to invoke provisions that it's in breach of, the lease itself. You went to the settlement agreement, didn't you, with CVS? Your Honor. And in that settlement agreement, this was after the bankruptcy. That's correct, Your Honor. But in that settlement agreement, you signed off letting CVS assert any defenses that it may have under the lease. So are you not recognizing that there are – I mean, just in the settlement agreement, never mind 365. Well, Your Honor, that's not exactly what the settlement agreement says. No. But the settlement agreement – Are you misreading? Well, Your Honor, it does say that CVS reserves the right to assert defenses to liability under the guarantee in the lease. That is correct. In the lease. But that doesn't indicate that GNS was accepting a position that they had such a right. And in fact – No, but I'm talking about the existence of a lease. You said they can assert defenses under the lease after the bankruptcy, after there was rejection in bankruptcy. I believe what CVS said was they reserved the right to assert those defenses. But the settlement agreement – You're saying there is no right. Pardon me? You're saying there is no – they had no right, and so you end up with zero. Correct. You start with zero and end with zero. Correct. And the settlement agreement was entered into after GNS made a written demand against CVS pursuant to the guarantee to pay then outstanding rent. And CVS originally did not pay outstanding rent, then the parties entered into an understanding. As part of that settlement agreement, CVS, which I believe it was doing in other cases involving linens and things, leases, because CVS had a portfolio of these guarantees. We've talked about it in our brief. They made similar arguments out in California in the Thousand Oaks case. It seemed like the district court was following case law in New Jersey. And one of the cases was the – you're familiar, I'm sure, with Caldwell Banker v. Plummer. That was Judge Chesler's opinion. And in that opinion, he says, the guarantor may assert the principal's claims in three instances. One of those, the third one, is the principal is insolvent. Your Honor, I recognize Judge Chesler's decision, and he's a distinguished jurist. However, I do believe Judge Chesler got the law wrong there. He did say that the District of New Jersey follows these rules, but he wasn't looking at them. He does incite to the Cruz case, which is the New Jersey Supreme Court case from 1999, that specifically says that – and I'm paraphrasing, so I won't say it specifically says that, but paraphrasing that although courts are conflating surety and guarantee in their jurisprudence, New Jersey still recognizes those distinctions between suretyship and a guarantee. And there is a difference in a legal basis between the two. On the one side, the guarantee, it's a separate obligation with two parties, between the principal and the obligor under the guarantee. And in a suretyship relationship, it's tripartite. The surety actually is a party to the underlying agreement and can be called upon to perform when the primary obligee under the suretyship agreement does not. But I'm surprised that you're not – I mean, I think – let's assume that what Judge Frent has quoted is accurate,  or established setoff or counterclaim, whatever. But under – I mean, the whole case, it seems to me, could rise and fall on Section 8.03 and the characterization of what is in there. In other words, is this co-tenancy provision a claim or a defense? It seems to me it – you should be arguing that it really isn't. It's an option and it's a right. But nothing says that the guarantor can exercise an option or a right. Agreed, Your Honor. And that's why – I mean, I don't know why you're getting into this surety-guarantee. Well, I'm trying – well, I was trying to answer the question of Judge Frent as in relation to why Judge Chessler said what he said in his opinion. But absolutely, Your Honor, that is our point. That is our argument. That is our brief, that the co-tenancy provision, it would have been a right. Linens and Things could have invoked if it was not in breach, if it had not gone bankruptcy – into bankruptcy, if it had not rejected the lease. It's not a claim. It's an exception. Well, that was an option, right? Correct. It actually uses the language option. And the district court found it was an option that, in fact, wasn't exercised by CVS. Correct. Well, it allowed CVS, the guarantor in this situation, to invoke that option. What changed this whole thing was the bankruptcy, right? I mean, if Linens didn't go bankrupt, it certainly could have asserted the minimum co-tenancy provision. Well, Your Honor, at some point in time, perhaps it could, but that's a hypothetical. Perhaps if Linens had not gone bankrupt, and we had this in our papers, Borders wouldn't have exercised the co-tenancy provision. The landlord wouldn't have lost Old Navy. So there's lots of hypotheticals here. But what happened here is Linens went bankrupt, and GNS bargained for an unconditional guarantee of CVS. Is there anything – Judge Rondeau just mentioned that apparently there's nothing that says that the guarantor can exercise or stand in the shoes of the insolvent. Not any – Right. But is there anything that says it cannot? Well, Your Honor, what we pointed to is the reason – there is case law that says a guarantor cannot normally invoke any rights of its – of the underlying outlook for it. There is case law in New Jersey? Well, yes, Your Honor. It's conflated. For example, what Judge Wiginton did, the district judge below, was she took the principles of suretyship, which say that if the primary obligor is insolvent, you can invoke a right – you can invoke a claim of set-off. You know what I've noticed, Mr. Filanga? All the courts are doing that. Perhaps – When you say conflating, they're mixing guarantor with surety, and they're back and forth. In some cases, they're using both to arrive at the same principle. Well, I agree, Your Honor, that there is a misuse or a relaxed use of the terms. But, again, we point back to the Supreme Court's decision. Did that case involve a lessee in bankruptcy? No, Your Honor, it did not. But, again, from a bankruptcy perspective, that is – why would you not – why would you want the guarantee because the tenant might go into bankruptcy? So to say that if a tenant goes into bankruptcy, the unconditional guarantor can then just invoke all sorts of provisions in the lease is at odds with the purpose of it, Your Honors. It seems weird to me that guarantors don't take assignments, you know, that they could exercise rights under leases in a situation like this, but I don't think that's normal commercial practice. It's not normal. That's neither here nor there. It's not normal commercial practice, Your Honor, although CVS could have assumed the lease in Lennon's bankruptcy if it actually wanted to step into the shoes. You're right. You're right. Thank you. Yeah, that's interesting. I hadn't thought about that. Good morning, Your Honors. My name is Jason St. John of Saul Ewing on behalf of CVS Pharmacy. May it please the Court. Your Honor, this Court should affirm Judge Wiginton's decision in which she properly decided that the lease between G&S and L&T guaranteed by CVS did not terminate by operation of law, by operation of the bankruptcy code, or by operation of any of the terms prior to CVS's termination of the lease in January 2010. Tell me how CVS gets the right to exercise the right to terminate and the option under Section 803. Guide me through, regardless of termination or maybe because of termination, how is it that CVS has that right? Yes, Judge Rendell. It starts actually with the first paragraph of the guarantee. And when you look at the first paragraph of the guarantee, the guarantee says, the unconditional guarantee says, that CVS's liability is to perform and fulfill the terms, conditions, and provisions of the lease and will pay damages as of the tenant's default. And that paragraph talks consistently about what CVS's obligations are under the lease. But it's an obligation to pay. Is it not? I don't agree with that, Your Honor. Really? I think it's an obligation to pay. So you're suggesting the guarantee made CVS a party to the lease then? I am not suggesting that at all, Your Honor. In fact, that's not the case. You're guaranteeing the performance of conditions of the lease? No. What CVS is saying is that in the guarantee, if there is a default, that CVS under the guarantee has certain obligations under the lease. And what Judge Chesler and Judge Wiginton found, and what is recognized in cases throughout the country, and we'll just stick with the insolvency exception because that matters here, is that in that instance, a guarantor can assert claims, and I want to get to your point, Judge Rundell, claims on behalf of the insolvent debtor that isn't in a position to do it. Well, yeah, if it relates to the obligation of the guarantor, I mean if there was a set-off or if there was a defense to the lease, then CVS can say, wait a minute, I don't owe you X. I owe you X minus because the tenant would have had that defense or claim. But, again, I think it gets back to the characterization of what 8.03 is. How do you construe the option to have alternative rent, an option that Judge Wiginton found was an option, and the right to cancel and terminate the lease? How do you get – how is it that CVS can exercise, affirmatively exercise those rights? So I think you have to look at the obligations in the lease are informed – the obligations in the lease are informed by the rights in the lease. And so the way to answer that is when you look at, for example, Section 5.05 of the lease that says that the landlord has the right to inspect CAM records and 6.04 of the lease that says that the landlord – excuse me, that the tenant has the right to contest real estate taxes and to get the backup on that. And so what the guarantor, when the – and this is the purpose of the exception, when the tenant, like Linens, is unable to assert those type of rights, the guarantor then gets to come in so that there is no windfall for the landlord and gets to essentially step in the shoes in that instance. Why is there windfall for the landlord? It's not a windfall. I mean, they bargained for – Linens and things didn't have a sterling credit foundation. And GNS, concerned about that, said, I want a guarantee before I let you sign the contract. Guarantee the amounts due on the lease, basically. So isn't your primary obligation to pay the default – the amount that was defaulted? And with the exception subject to then CVS's ability to exercise the rights. You step in the shoes of – how do you get to that? What case says that they exercise and step in the shoes of the principal? I mean, I'm aware of cases that they can assert the claims, setoffs, defenses, counterclaims that the tenant would have, that its principal would have. Where – what case says it stands in the shoes and can exercise affirmatively the tenant's rights without an assignment? Judge Rendell, the best case I can point you to is out of the Second Circuit. It's a 1989 case. It's Sinema and Corp v. Plaza at Latham Associates. Is this in your brief? Actually, Your Honor, I do not believe it is in our brief because this is an issue that was raised on the reply. All right. What – It's 867 F. 2nd 135. And the import – All right. Give it back again. Give us the site and give us the name again. Sure. It's Sinema and Corp v. Plaza at Latham Associates. 867 F. 2nd 135. It's a Second Circuit case from 1989. Let me tell you what the import of that case is. Well, if not the import, tell us the holding. The holding of that case was that the guarantor sought specific performance under the lease. The guarantor sought to enforce the rights that the tenant would have had, and the Second Circuit said that the guarantor was entitled to obtain specific performance that the tenant would have been able to assert. What theory? Was it specific language in that case, or why is that? I think what you would see in that case is that the court found that specific performance was a means of enforcing the terms of the contract, and so by applying the insolvency exception, that it was a means for the guarantor to be able to enforce the terms of the contract, which goes to Judge Rendell's point of can CVS exercise a right, and in that case, while you won't find magic words in that case to say guarantor steps in the shoes of the tenant, when you read the case and what it stands for in terms of the ability of the tenant to be able to enforce the terms, excuse me, the ability of the guarantor to enforce the terms of the contract, that's what CVS is seeking to do here. We have to apply New Jersey law, don't we? New Jersey law would apply to that issue. What is the closest case that you have under New Jersey contract law that supports your position? Well, Your Honor, I think the Cruz-Mendez case, which is briefed, relies upon the restatement third of suretyship and guarantee,  which New Jersey law does recognize, does talk about how it doesn't even actually require insolvency. It allows when the principal obligor, so in this case, Linens and things, is not able, for whatever reason, to assert its own rights that a guarantor would be able to assert rights. The New Jersey Supreme Court says that? Your Honor, the Cruz case cites to that with support. Correct. The Cruz case cites to the restatement third of suretyship. I want to make sure I'm clear. The Cruz case does not stand for that proposition. It cites with New Jersey approval the restatement third of suretyship and guarantee. And if you were to look at Section 34 of the restatement third of suretyship and guarantee, I believe you will find that in an instant like this, CVS, because Linens and things, is not in a position to be able to assert rights. And the reason why you have a general rule like that is that you don't want two different parties to be asserting rights, taking different positions simultaneously, which is why if Linens and things was able to assert rights, the restatement, as well as Judge Chester would recognize, that CVS wouldn't be able to assert its rights. Judge Whittington's conclusion, though, is not just asserting rights. It's that CVS could, in effect, terminate the lease. Isn't that a step farther that all of a sudden the guarantor comes in and not just assert right under, but actually terminates and nullifies the lease? Your Honor, you raise a very good point, and it goes back to, we've heard about why GNS wanted this guarantee. I think we should think about why CVS agreed to this guarantee. It agreed to this guarantee because of the provisions in the lease. Well, it agreed to the guarantee because it had a tenant that wanted to go into the property, and the guarantee was required to be given. And presumably it wasn't CVS, it was its predecessor that signed on to these wonderful things. It is absolutely that. But if you think about the provisions of 8.01 and 8.03, the 8.01 is the going dark provision, the 8.03 is the important key tenants provision. CVS guaranteed a lease where GNS said, we will maintain those key tenants. And that was also very important to CVS as a guarantor, because if those key tenants aren't there, it makes it harder for the landlord to ultimately mitigate damages if there's a default and triggers CVS's obligations. It doesn't read too much into 8.03. I mean, it says it's warrants, it's going to try to do that, and it gives the tenant the option to do the alternate payment. I think you're maybe reading a little too much into 8.03. Well, I think what it does say is that if one of those co-tenants in 8.03 is no longer in the shopping center for 12 consecutive months, that it gives the tenant, is what the lease says, the right to be able to terminate. Which would have been fine. If Linens and Things were operating and this happened to it, it would have that right. But, you know, the fact scenario we have here, it's a little bit disingenuous to say that that's the situation. I mean, you know, Linens and Things was already dark itself. So it's not like it was being harmed on an ongoing basis by virtue of the fact that there were, you know, other tenants that weren't there. I mean, it wasn't there. This is kind of a gotcha provision a year afterwards to say, oh, by the way, you know, these people aren't here, so we're being harmed. It's not a gotcha provision. It's actually a provision that is negotiated by two sophisticated parties. What G&S agreed. Yeah, it was negotiated for a certain fact pattern that really didn't happen here. I'm not sure that's necessary. I'm not necessarily sure. I don't think we have anything in the record to indicate what the negotiations were. What we have is Section 8.01, which allows Linens to go dark. There's a specific provision in there that allows it to go dark. And that is what happened here. And I think the record is clear. But it didn't avail itself of that provision. It breached, right? It breached. And then I think as Joshuente has recognized, there was a settlement agreement. And that breach was secured in that settlement agreement. I mean, I don't think there's any other. CVS paid the obligations. But the rejection caused the breach. That breach wasn't undone by virtue of the guarantor paying on its obligation. I actually think the first breach occurred before the rejection of the nonpayment, I think the record would reflect, occurred before the rejection, not the filing. But the settlement agreement was after the rejection. The settlement agreement was absolutely after. And you're saying it undid the breach? The settlement agreement. So when GNS made a demand upon CVS, CVS immediately honored its obligations and paid all undue monies. Which was its obligation under the guarantee. The tenant was still in breach. Which was its obligation under the guarantee. Right. But Linens and Things had still breached. Linens and Things had still breached. And now Linens and Things, and if you apply the insolvency exception that Judge Chesler did and the Second Circuit has and the Sixth Circuit has and various district courts across the country have, it says a guarantor like CVS should be able to assert whatever the claims rights that Linens and Things would have been able to assert. Well, you threw rights in there. Claims is one thing, but you kind of threw rights in there. And I don't think that's that clear. Well, I mean, I think if you, and I'll point you to the Burlington County Abstract Company case, which we do cite where, you know, claim is defined to include rights. And I think Judge Ambrose in Kristen v. Brennan also refers to and uses the terms claims and rights. I do think it's used indiscriminately. I don't think there's a determination on that. One of the points is everybody talks about how clear the language is. Clearly none of the language, I mean, this could have been, this all could have been part of either the guarantee or the lease, but it's not. We're all sort of going outside the bounds of both of those documents. We have to in order to get to where you want us to go, right? I actually don't think that's accurate.  You see that the lease is referred, the obligations of the guarantor are informed by the lease. You can't look at that guarantee alone without going back to the lease to understand what the obligations were under the lease. Well, but it's a full and prompt performance. The guarantee is of the full and prompt performance of the terms of the lease. So they're obligating themselves to perform the obligations. I guess that's where you have to find what is the obligation. And I think that's exactly what CVS did here. It performed the obligations it had, that Linus would have had, and had GNS elected to terminate the lease by its terms, by providing notice and terminating the lease and accelerating, maybe we wouldn't be here. Isn't the primary purpose, the primary reason why commercial landlords seek guarantors is to pay potential debts of tenants, potential debts of tenants under the lease? Isn't that your primary responsibility? If that is the obligation, absolutely. Isn't that your obligation? That is the obligation of the tenant in this instance, and that's what it did. It paid the obligations it had until the lease informed that CVS no longer had that obligation and had the right to be able to terminate. I see that my time is up. I don't know if the Court has any other questions. No, I think we're fine. Thank you. Thank you, Your Honor.  Thank you, Your Honors. CVS did not perform any of the obligations of Linus after the default. They paid money, and Your Honors made pointed questions to that. That's what the guarantee required, to pay, they shall pay GNS for amounts that arise, damages due to Linus' default. So there was, in fact, it was the exact opposite. GNS did all the actions after taking possession of the property, changing the locks, all those different things. And I want to talk just for a few minutes, well, less than a few minutes about the co-tenancy provision, because assuming all the things that CVS says are true, and it could step into the shoes of Linus and exercise a right or an option, it didn't even do that correctly, and Judge Wigginton ignored that. One of the provisions in the co-tenancy section was to provide the landlord with 12 months' notice that this election was being made. And the reason for that is the landlord then has the opportunity, knowing that an election is being made, to potentially cure that deficiency, get a replacement tenant, something of that nature. None of that happened here. What about that January letter? Did it say, did it give notice, hey, you've been invoking this? It gave notice after the fact and did not give prospective notice. In other words, it didn't elect at that time and then wait 12 months and then seek to terminate. It did it all retroactively, and Judge Wigginton allowed it, and that's another basis why we believe there was error. Assuming, again, the main – If the condition persists for a period of 12 consecutive months or more, the tenant shall have the right to cancel and terminate the lease. Where does it say you have to let them know at the beginning? Everyone knows that, you know, it's gone dark. You can see that there's not a store there. Because you have to – if Lenin's had the right to do that, Your Honor, which, again, they did not. They had to elect that option and give notice to the landlord that it was so doing. Well, it's a question of what condition we're talking about. Is the condition that they had elected for the alternative rent, or is the condition that the others were – the two, you know, were not operating, if you will? But at bottom, Your Honors, the main point is that this is an unconditional guarantee. The references in the Cruz decision to the law of suretyship is a decision in which the Supreme Court of New Jersey recognizes those distinctions. This is a guarantee, and public policy, the law enforcing unconditional guarantees, is important in this context that guarantors pay unconditional guarantees as they bargain for it. Mr. St. John says that under the restatement of surety and guarantors, he is permitted to assert the defenses of the principle. Well, Your Honor, it's the restatement of surety. It doesn't speak to the distinct nature of a guarantee, which is a two-party agreement. Thank you, Your Honors.